ROBBINS GELLER RUDMAN
  & DOWD LLP
X. JAY ALVAREZ (134781)
DOUGLAS R. BRITTON (188769)
JEREMY W. DANIELS (351347)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
jaya@rgrdlaw.com
dougb@rgrdlaw.com
jdaniels@rgrdlaw.com

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| CITY OF WEST PALM BEACH POLICE PENSION FUND, on Behalf of Itself and All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>        vs.<br><br>XPONENTIAL FITNESS, INC., ANTHONY GEISLER, JOHN MELOUN, MARK GRABOWSKI, BRENDA MORRIS, CHELSEA GRAYSON, BofA SECURITIES, INC., JEFFERIES LLC, MORGAN STANLEY& CO. LLC, GUGGENHEIM SECURITIES, LLC, PIPER SANDLER & CO., ROBERT W. BAIRD & CO. INCORPORATED, RAYMOND JAMES & ASSOCIATES, INC., ROTH CAPITAL PARTNERS, LLC, and R. SEELAUS & CO., LLC,<br><br>                              Defendants. | Case No.    8:24-cv-01333<br><br><u>CLASS ACTION</u><br><br>COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><u>DEMAND FOR JURY TRIAL</u> |

Lead Plaintiff City of West Palm Beach Police Pension Fund ("Lead Plaintiff"), on behalf of itself and all others similarly situated, by Lead Plaintiff's undersigned attorneys, alleges the following based upon information and belief as to the investigation conducted by Lead Plaintiff's counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Xponential Fitness, Inc. ("Xponential" or the "Company"), the findings of Fuzzy Panda Research ("Fuzzy Panda"), securities analyst reports, press releases, and other public statements issued by, or about, the Company.  Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

1.      Jurisdiction is conferred by 28 U.S.C. §1331 and §22 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §77v.  The claims asserted herein arise under §§11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2), and 77o.

2.      Venue is proper in this District pursuant to §22 of the Securities Act, because Xponential is headquartered in this District and conducts business in this District and the events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements into this District.

## SUMMARY OF THE ACTION

3.      This is a securities class action on behalf of all purchasers of Xponential's Class A common stock pursuant to the Registration Statement and Prospectus (the "Offering Documents") issued in connection with Xponential's secondary offering (the "SPO") on or about April 6, 2022 (the "Offering"), seeking to pursue strict liability remedies under the Securities Act.[1]  The Offering Documents for

---

[1]      References to the Offering Documents for the SPO include Xponential's Form 10-K Annual Report for the year ended December 31, 2021 ("December 31, 2021

the SPO were negligently prepared and, as a result, contained materially false and misleading statements of fact and failed to disclose material facts as required under the rules and regulations governing the preparation of such documents.

4.     Xponential claims to be the largest global franchisor of boutique fitness brands, with a platform offering ten brands in categories that include Pilates, indoor cycling, barre, stretching, rowing, dancing, boxing, running, functional training, and yoga.  The Company represents that its franchisees offer accessible and personalized workout experiences led by highly qualified instructors in over 2,600 studio locations across 48 U.S. states, the District of Columbia, and Canada.  Xponential also maintains master franchise or international expansion agreements in 14 additional countries.  As of December 31, 2021, Xponential had over 1,700 franchisees and licenses for more than 1,900 studios contractually obligated to be opened under existing franchise agreements in North America.

5.     Defendants represent that Xponential had built its portfolio of brands through a series of acquisitions, targeting select health and wellness providers. According to the Company's filings with the SEC, its portfolio of brands includes: (i) Club Pilates, the largest Pilates brand in the United States; (ii) CycleBar, the largest indoor cycling brand in the United States; (iii) StretchLab, a concept offering one-on-one and group stretching services; (iv) Row House, the largest franchised indoor rowing brand in the United States; (v) AKT, a dance-based cardio workout combining toning, interval, and circuit training; (vi) YogaSix, the largest franchised yoga brand in the United States; (vii) Pure Barre, a total body workout that uses the ballet barre to perform small isometric movements, and the largest barre brand in the United States; (viii) Stride, a treadmill-based cardio and strength training concept; (ix) Rumble, a

---

Form 10-K"), which was expressly incorporated by reference into the Offering Documents for the SPO.  Statements in the Offering Documents for the SPO thus repeated and restated statements made in the December 31, 2021 Form 10-K.

4862-2298-6440.v1

boxing-inspired full-body workout; and (x) Body Fit Training, a functional training and strength-based program.

6.     The Offering Documents for the SPO made a number of representations that were false and that omitted information that was necessary to make those statements not misleading.   Those statements included: (i) claims about the Company's "key performance indicators," including Average Unit Volume ("AUV") and Same-Store-Sales ("SSS"); and (ii) claims about franchise licenses sold and the number of studios opened.

7.     The foregoing statements in the SPO Offering Documents were each materially false and misleading when made because they omitted that:

(a)     Xponential had permanently closed at least 30 stores;

(b)     Xponential's reported SSS and AUV metrics had been misstated by excluding underperforming stores;

(c)     8 out of 10 Xponential brands were losing money monthly;

(d)     over 50% of Xponential studios did not make a positive financial return;

(e)     over 60% of Xponential's revenue was one-time and non-recurring;

(f)     more than 100 of the Company's franchises were for sale at a price that is at least 75% less than their initial cost;

(g)     Xponential had misled many of its franchisees into opening franchises by misrepresenting the financial profile and profitability of its studios, as well as the expected rate of return for new studio openings;

(h)     many Xponential franchisees were substantially in debt, suffering high attrition rates, and running non-viable studios that had no realistic path to profitability; and

4862-2298-6440.v1

1        (i)    based on the foregoing, defendants lacked a reasonable factual

2  basis for their positive statements about Xponential's then-current business operations

3  and future financial prospects set forth in the SPO Offering Documents.

4       8.    On the basis of the materially misleading statements in the SPO Offering

5  Documents, Lead Plaintiff was enticed to purchase shares of Xponential common

6  stock in the Offering and, along with other Class members (defined herein), suffered

7  damages and financial losses.

8       9.    After the SPO Offering, the truth regarding these statements was revealed

9  to the market.  On June 26, 2023, short-biased analyst firm Fuzzy Panda published a

10  research report titled "Xponential Fitness (XPOF) – 'Abusive Franchisor That Is A

11  House Of Cards'" (the "Fuzzy Panda Report"), which disclosed that many franchisee

12  stores were losing money and not returning a profit.  The Fuzzy Panda Report also

13  disclosed that the Company's key performance indicators (SSS and AUV)

14  misleadingly excluded underperforming stores.

15      10.    After the Fuzzy Panda Report was issued, the price of Xponential

16  common stock plummeted more than ***37%***, or $9.39 per share on heavy trading

17  volume, to close at $15.72 per share on June 27, 2023.

18      11.    On December 7, 2023, *Bloomberg Businessweek* ("*Bloomberg*")

19  published an article on Xponential titled "Club Pilates, Pure Barre Owners Say

20  Xponential Left Them Bankrupt," which corroborated the Fuzzy Panda Report's

21  revelations.  Among other revelations, the article disclosed that Xponential caused

22  "many of the company's franchisees . . . [to] have either declared bankruptcy or los[e]

23  their retirement savings."

24      12.    Following the publication of the *Bloomberg* article, the price of

25  Xponential common stock fell more than 26% over two trading days on heavy trading

26  volume to close at less than $9 per share on December 11, 2023.

27

28

4862-2298-6440.v1

13.     On December 11, 2023, Xponential announced that on December 5, 2023 the Company was contacted by the SEC, requesting that the Company provide it with certain documents.  The SEC investigation is currently ongoing.

14.     On May 10, 2024, the Company issued a press release announcing that "[t]he Board has removed Anthony Geisler from his duties and suspended him indefinitely as CEO, also effective immediately" and that "[t]he Company received notice on May 7, 2024 of an investigation by the United States Attorney's Office for the Central District of California."  On this news, the price of Xponential stock fell 31% to close at $8.48 per share on May 10, 2024, down from a close of $12.37 per share the previous day.

15.     The price of Xponential stock has declined significantly and now trades below the SPO price of $20 per share.  Lead Plaintiff and the Class have suffered damages as a result of the material false and misleading statements in the Offering Documents.

## PARTIES

16.     Lead Plaintiff City of West Palm Beach Police Pension Fund purchased Xponential common stock in or traceable to the SPO and has been damaged thereby. Specifically, Lead Plaintiff purchased 3,380 shares of Xponential stock on April 11, 2022 through Merrill Lynch Pierce Fenner & Smith, a sister company of Lead Underwriter BofA Securities, Inc., at the offering price of $20 per share and was not charged a commission.  Lead Plaintiff's purchase price was lower than the lowest trading pricing of Xponential stock of $21.66 per share on the open market that trading day.

17.     Defendant Xponential claims to be the largest global franchisor of boutique fitness brands.  The Company maintains its principal executive offices in Irvine, California and its common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "XPOF."  Xponential is the issuer of the stock sold in the SPO.

18.     Defendant Anthony Geisler ("Geisler") served as Xponential's Chief Executive Officer ("CEO") at the time of the SPO and signed the Registration Statement for the SPO.

19.     Defendant John Meloun ("Meloun") served as Xponential's Chief Financial Officer ("CFO") at the time of the SPO and signed the Registration Statement for the SPO.

20.     Defendant Mark Grabowski served as a Director at the time of the SPO and signed the Registration Statement for the SPO.

21.     Defendant Brenda Morris served as a Director at the time of the SPO and signed the Registration Statement for the SPO.

22.     Defendant Chelsea Grayson served as a Director at the time of the SPO and signed the Registration Statement for the SPO.

23.     Defendants Geisler, Meloun, Grabowski, Morris, and Grayson are referred to collectively as the "Individual Defendants."

24.     Defendant BofA Securities, Inc. ("BofA") served as an underwriter and underwriter representative for the SPO.

25.     Defendant Jefferies LLC ("Jefferies") served as an underwriter and underwriter representative for the SPO.

26.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as an underwriter for the SPO.

27.     Defendant Guggenheim Securities, LLC ("Guggenheim") served as an underwriter for the SPO.

28.     Defendant Piper Sandler & Co. ("Piper Sandler") served as an underwriter for the SPO.

29.     Defendant Robert W. Baird & Co. Incorporated ("Robert Baird") served as an underwriter for the SPO.

30.     Defendant Raymond James & Associates, Inc. ("Raymond James") served as an underwriter for the SPO.

31. Defendant Roth Capital Partners, LLC ("Roth Capital") served as an underwriter for the SPO.

32. Defendant R. Seelaus & Co., LLC ("R. Seelaus") served as an underwriter for the SPO.

33. Under the terms and subject to the conditions in the SPO underwriting agreement, the number of shares allotted to each of these underwriters in the SPO are set forth in ¶39 below.

34. All of the underwriters listed in ¶¶24-32 are collectively referred to herein as the "Underwriter Defendants." The Underwriter Defendants solicited their brokerage clients and other members of the investing public to submit indications of interest and subscriptions to purchase Xponential stock in the SPO.

35. The Underwriter Defendants are responsible for the false and misleading statements in the SPO Offering Documents for which they served as an underwriter. The Underwriter Defendants assisted Xponential and the Individual Defendants in planning the SPO and were required to conduct an adequate and reasonable investigation in the business and operations of the Company in order to participate in the SPO – a process known as a "due diligence" investigation. During the course of their investigation, the Underwriter Defendants had continual access to confidential corporate information concerning Xponential's operations and commercial prospects.

36. In addition to access to internal corporate documents, agents of the Underwriter Defendants met with Xponential's counsel, management, and top executives and made joint decisions with them regarding: (i) the terms of the SPO, including the price at which Xponential shares would be sold to the public; (ii) the strategy to best accomplish the SPO; (iii) the information to be included in the SPO Offering Documents; and (iv) the responses to be made to the SEC in connection with its review of the SPO Offering Documents.

37. Xponential, the Individual Defendants, and the Underwriter Defendants are referred to collectively as the "Securities Act Defendants."

4862-2298-6440.v1

## BACKGROUND OF THE OFFERING

38.     On April 4, 2022, Xponential filed with the SEC a Registration Statement and Preliminary Prospectus for the SPO for the sale of 4.5 million shares.   The Company then entered into an underwriting agreement with certain selling stockholders and certain underwriters, pursuant to which the selling stockholders sold 4,500,000 shares of Class A common stock at a price of $20.00 per share.  The shares were then sold to members of the Class.

39.     The Underwriter Defendants who served as underwriters and underwriter representatives for the SPO are as follows:

| Underwriter | Number of Shares |
| --- | --- |
| BofA Securities, Inc. | 1,657,582 |
| Jefferies LLC | 1,243,187 |
| Morgan Stanley & Co. LLC | 508,846 |
| Guggenheim Securities, LLC | 254,423 |
| Piper Sandler & Co. | 254,423 |
| Robert W. Baird & Co. Incorporated | 218,077 |
| Raymond James & Associates, Inc. | 218,077 |
| Roth Capital Partners, LLC | 127,212 |
| R. Seelaus & Co., LLC | 18,173 |
| Total | 4,500,000 |

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS FOR THE SPO

40.     The Offering Documents for the SPO contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with SEC rules and regulations governing the preparation of such documents.

- 8 -

41.     The Offering Documents for the SPO made a number of representations regarding certain "key performance indicators," including AUV and SSS.  The Offering Documents claimed that franchisees would generate AUV of approximately $500,000 in year two of operations and that the Company had generated a run-rate AUV of $287,000 in fourth quarter 2020 and $446,000 in fourth quarter 2021:

>    The Xponential Playbook is designed to help franchisees achieve compelling Average Unit Volumes ("AUVs"), strong operating margins and an attractive return on their invested capital.  Studios are generally designed to be between 1,500 and 2,500 square feet in size, depending on the brand.  The smaller box format contributed to a relatively low average initial franchisee investment of approximately $350,000 in 2021 and 2020.  ***By utilizing the Xponential Playbook, our model is designed to generate, on average, an AUV of approximately $500,000 in year two of operations and studio-level operating margins ranging between 25% and 30%, resulting in an unlevered cash-on-cash return of approximately 40%.***

>                                          *          *          *

>    Highlights of our platform's recent financial results and growth include: . . . ***grew run-rate AUV from $287,000 in the fourth quarter of 2020 to $446,000 in the fourth quarter of 2021***, representing an increase of 55%.

42.     The Offering Documents for the SPO also emphasized the number of licenses Xponential had sold and the studios that it had opened, including, but not limited to, the following:

>    As a franchisor, we benefit from multiple highly predictable and recurring revenue streams that enable us to scale our franchised studio base in a capital efficient manner.  ***Our system has significant embedded growth based on already-sold licenses for studios that have not yet***

- 9 -

*opened.  As of December 31, 2021, franchisees were contractually obligated to open an additional 1,806 studios in North America.* Converting our current pipeline of licenses sold to open studios in North America would nearly double our existing franchised studio base.  Based on our internal and third-party analyses by Buxton Company, we estimate that franchisees could have a total of approximately 7,900 studios in the United States alone.

*      *      *

Highlights of our platform's recent financial results and growth include: . . . *grew the number of global open studios from 1,796 as of December 31, 2020 to 2,130 as of December 31, 2021*, representing an increase of 19%; . . . *grew global franchise licenses sold from 3,469 as of December 31, 2020 to 4,424 as of December 31, 2021*, representing an increase of 28%; . . . .

*      *      *

**Large and expanding franchisee base with visible organic growth**.

Our large number of existing licenses sold represents an embedded pipeline to support the continued growth of our business.  *As of December 31, 2021, on a cumulative basis since inception, we had 4,424 franchise licenses sold globally, compared to 1,508 franchise licenses sold as of December 31, 2017*, on an adjusted basis to reflect historical information of the brands we have acquired.  Franchisees are contractually obligated to open studios in their territories after purchasing a franchise license.  In the event that franchisees are unable to meet their contractual obligations, we have the ability to resell or reassign their territory license(s) to another franchisee in the system or our franchisee pipeline.  Based on our experience as a franchisor, we believe that a significant majority of our licenses sold will convert into

- 10 -

operating studios.  Accordingly, we have the potential to substantially increase our studio base through our existing licenses sold, providing us high visibility into our unit growth and further increasing our already significant scale within the boutique fitness industry.

*      *      *

**We have grown our franchised studio footprint in North America from 813 open studios across 47 U.S. states, the District of Columbia and Canada as of December 31, 2017 to 1,954 open studios across 48 U.S. states, the District of Columbia and Canada as of December 31, 2021**, on an adjusted basis to reflect historical information of the brands we have acquired, representing a CAGR of 25%.  **As of December 31, 2021, we had 1,556 franchisees and licenses for 1,806 studios contractually obligated to be opened under existing franchise agreements in North America.  We sold 787 licenses in 2021 compared to 265 licenses in 2020 and 923 licenses in 2019 in North America**.

43.     The statements referenced in ¶¶41-42 above were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts that existed at the time of the SPO:

(a)     that Xponential had permanently closed at least 30 stores;

(b)     that Xponential's reported SSS and AUV metrics had been misstated by excluding underperforming stores;

(c)     that 8 out of 10 Xponential brands were losing money monthly;

(d)     that over 50% of Xponential studios did not make a positive financial return;

(e)     that over 60% of Xponential's revenue was one-time and non-recurring;

(f)     that more than 100 of the Company's franchises were for sale at a price that is at least 75% less than their initial cost;

- 11 -

(g)     that Xponential had misled many of its franchisees into opening franchises by misrepresenting the financial profile and profitability of its studios, as well as the expected rate of return for new studio openings;

(h)     that many Xponential franchisees were substantially in debt, suffering high attrition rates, and running non-viable studios that had no realistic path to profitability; and

(i)     that based on the foregoing, defendants lacked a reasonable factual basis for their positive statements about Xponential's then-current business operations and future financial prospects set forth in the SPO Offering Documents.

44.    In addition to the materially false and misleading statements in the Offering Documents identified above, the Securities Act Defendants also violated their affirmative obligations to provide certain material information in the SPO Offering Documents as required by applicable SEC rules and regulations.

45.    Item 303 of SEC Regulation S-K, 17 C.F.R §229.303 ("Item 303"), required the SPO Offering Documents to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

46.    The failure of the SPO Offering Documents to disclose the adverse economic circumstances various franchisees were facing violated Item 303 because these undisclosed facts, trends, and uncertainties were known and because these undisclosed facts, trends, and uncertainties would and did have an unfavorable impact on the Company's sales, revenues, and income from continuing operations.

47.    In addition, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required, in the "Risk Factors" section of the SPO Offering Documents, a discussion of the most significant factors that made the SPO risky or speculative and that each risk factor adequately describe the risk.  Because the omitted material facts alleged in ¶¶7, 9, 11, and 43 were not disclosed, as well as the consequent material

1  adverse effects on the Company's results and prospects, the Securities Act Defendants

2  violated Item 105.

3      48.    In negligent violation of Item 105 and Item 303, the SPO Offering

4  Documents failed to disclose the significant problems with the overall financial health

5  of Xponential's franchisee base, specifically, that: (i) Xponential was misrepresenting

6  its AUV and SSS metrics; and (ii) a significant number of Xponential franchisees

7  were losing money every month.

8      49.    On June 26, 2023, Fuzzy Panda published the Fuzzy Panda Report,

9  which, among other things, represented that: (i) defendant Geisler has had a long

10 history of misleading investors; (ii) Xponential has issued a series of misleading

11 statements about its store closures and the overall financial health of its franchisee

12 base; (iii) more than 50% of the Company's studios never make a positive financial

13 return; (iv) more than 100 of the Company's franchises are for sale at a price that is at

14 least 75% less than their initial cost; (v) 8 out of 10 Xponential brands are losing

15 money monthly; (vi) the Company's publicly reported SSS and AUV metrics

16 misleadingly exclude underperforming stores; (vii) over 60% of Xponential's revenue

17 is one-time and non-recurring; (viii) the Company charged franchisees a premium on

18 fitness equipment, despite promising to leverage its relationships with vendors to

19 obtain lower prices; and (viii) at least 30 Xponential stores had been permanently

20 closed.

21     50.    In response to these revelations, the price of Xponential common stock

22 fell more than *37%*, or $9.39 per share on heavy trading volume of over 12 million

23 shares traded, to close at $15.72 per share on June 27, 2023.

24     51.    On June 28, 2023, Xponential issued a response to the Fuzzy Panda

25 Report.  Although the Company's response attempted to refute the Fuzzy Panda

26 Report, it did not address certain aspects of the Fuzzy Panda Report directly or

27 concretely – such as the allegation that eight out of ten of the Company's brands are

28 losing money or detail whether any stores had been permanently closed.  With respect

1    to the Company's calculation of SSS and AUV, the response stated in pertinent part as

2    follows:

3    •    AUV Calculation: Quarterly Run-rate AUV consists of

4    average quarterly sales for all studios that are at least six months old at

5    the beginning of the respective quarter, multiplied by four.  Studios with

6    zero sales in the period have always been excluded from the calculation.

7    Inclusion of these studios would not result in a material difference.  For

8    Q1 2023, recalculating Xponential's systemwide AUV to include these

9    studios would result in a 0.9% change to the AUV figure ($542,000 vs.

10   $538,000).

11   •    SSS Calculation: Studios are not included in SSS

12   calculations unless they have 13 months of continuous sales.  This is a

13   common method for calculating same store sales and is disclosed in

14   Xponential's audited SEC filings.  The Q1 2023 data set of almost 2,000

15   studios open continuously for 13 months or longer as of March 31, 2023

16   yielded robust Q1 2023 same store sales of 20%.

17   52.    As summarized by a Piper Sandler analyst report issued in support of the

18   Company and relaying its conversations with management: "Any studio that generates

19   zero sales for even just one month is removed until 13 consecutive months of sales are

20   generated again."  Although these responses sought to downplay the impact of the

21   accounting tactic on Xponential's overall financial results, they essentially confirmed

22   a key allegation of the Fuzzy Panda Report: that the Company excludes studios that

23   have no sales in a given month even if the lack of sales is due to underperformance.

24   53.    Then, on December 7, 2023, *Bloomberg* published a damning exposé on

25   the Company that largely corroborated the Fuzzy Panda Report's allegations titled

26   "Club Pilates, Pure Barre Owners Say Xponential Left Them Bankrupt."  The article

27   stated that *Bloomberg* had interviewed dozens of former business partners, employees,

28   and  franchisees  of  the  Company  who  revealed  that  Xponential  misled  many

- 14 -

franchisees into a "financial nightmare." The article stated that defendant Geisler "has a track record of combative management, deploying growth-at-all-costs tactics and unleashing aggressive reprisals against anyone who gets in his way." The article disclosed that these unscrupulous tactics caused "many of the company's franchisees . . . [to] have either declared bankruptcy or los[e] their retirement savings" and described in detail the ways in which Xponential obscured the true financial health of its studios and induced franchisees to open new studios based on false and misleading information regarding their financial health and likely profitability.

54.     Following the publication of the *Bloomberg* article, the price of Xponential common stock fell more than 26% over two trading days on heavy trading volume to close at less than $9 per share on December 11, 2023.

55.     On May 10, 2024, the Company issued a press release announcing that "[t]he Board has removed Anthony Geisler from his duties and suspended him indefinitely as CEO, also effective immediately" and that "[t]he Company received notice on May 7, 2024 of an investigation by the United States Attorney's Office for the Central District of California." On this news, the price of Xponential stock fell 31% to close at $8.48 per share on May 10, 2024, down from a close of $12.37 per share the previous day.

## CLASS ACTION ALLEGATIONS

56.     Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased Xponential common stock pursuant or traceable to the SPO and who were damaged thereby (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

57.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the relevant period, Xponential common stock was

- 15 -

1  actively traded on the NYSE.  While the exact number of Class members is unknown

2  to Lead Plaintiff at this time and can only be ascertained through appropriate

3  discovery, Lead Plaintiff believes that there are thousands of members in the proposed

4  Class.  Record owners and other members of the Class may be identified from records

5  maintained by Xponential or its transfer agent and may be notified of the pendency of

6  this action by mail, using the form of notice similar to that customarily used in

7  securities class actions.

8          58.    Lead Plaintiff's claims are typical of the claims of the members of the

9  Class, as all members of the Class are similarly affected by the false and misleading

10  statements in the Offering Documents in violation of federal law complained of

11  herein.

12          59.    Lead Plaintiff will fairly and adequately protect the interests of the

13  members of the Class and has retained counsel competent and experienced in class

14  action and securities litigation.

15          60.    Common questions of law and fact exist as to all members of the Class

16  and predominate over any questions solely affecting individual members of the Class.

17  Among the questions of law and fact common to the Class are:

18                  (a)    whether the federal securities laws were violated by defendants'

19  acts as alleged herein;

20                  (b)    whether the SPO Offering Documents misrepresented material

21  facts about the business and operations of Xponential; and

22                  (c)    the amount of damages the members of the Class have sustained.

23          61.    A class action is superior to all other available methods for the fair and

24  efficient adjudication of this controversy since joinder of all members is

25  impracticable.  Furthermore, as the damages suffered by individual Class members

26  may be relatively small, the expense and burden of individual litigation make it

27  impossible for members of the Class to individually redress the wrongs done to them.

28  There will be no difficulty in the management of this action as a class action.

4862-2298-6440.v1

**COUNT I**

**For Violation of §11 of the Securities Act**
**Against the Securities Act Defendants**

62. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

63. This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against the Securities Act Defendants.

64. The Securities Act Defendants are liable under theories of strict liability for their violations of §11 of the Securities Act. This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. Lead Plaintiff does not allege that the Securities Act Defendants acted with scienter or fraudulent intent.

65. The SPO Offering Documents used to complete the Offering contained untrue statements of material fact, omitted to state material facts required to be stated therein, and/or omitted to state other facts necessary to make the statements made therein not misleading.

66. By reason of the conduct herein alleged, each defendant named herein violated §11 of the Securities Act.

67. Lead Plaintiff acquired Xponential stock in and traceable to the SPO.

68. Lead Plaintiff and the Class have sustained damages as the value of the stock issued in the SPO has declined due to the Securities Act Defendants' violations.

69. At the time of their purchases of Xponential stock issued in the SPO, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Lead Plaintiff commenced

- 17 -

this action.  Less than three years have elapsed between the time that the stock upon which this Count is brought was offered to the public and the time Lead Plaintiff commenced this action.

## COUNT II

### For Violations of §12(a)(2) of the Securities Act
### Against the Securities Act Defendants

70.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

71.     This Count is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of the Class, against the Securities Act Defendants.

72.     The Securities Act Defendants are liable under theories of strict liability for their violations of §12(a)(2) of the Securities Act.  This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.  Lead Plaintiff does not allege that the Securities Act Defendants had scienter or fraudulent intent.

73.     By means of the defective SPO Offering Documents, the Securities Act Defendants issued, promoted, and sold Xponential stock to Lead Plaintiff and other members of the Class for their own benefit and the benefit of those associated with them.  The Underwriter Defendants additionally solicited their brokerage clients and other members of the investing public to submit indications of interest and subscriptions to purchase Xponential stock in the SPO.

74.     The SPO Offering Documents used to complete the SPO contained untrue statements of material fact, omitted to state material facts required to be stated therein, and/or omitted to state other facts necessary to make the statements made therein not misleading.

75.     The Securities Act Defendants owed Lead Plaintiff and the other members of the Class who purchased Xponential stock pursuant to the SPO Offering

1  Documents the duty to make a reasonable and diligent investigation of the statements

2  contained in the SPO Offering Documents to ensure that such statements were true

3  and that there was no omission to state a material fact required to be stated in order to

4  make the statements contained therein not misleading.  The Securities Act Defendants,

5  in the exercise of reasonable care, should have known of the misstatements and

6  omissions contained in the SPO Offering Documents as set forth above.

7        76.     By reason of the conduct alleged herein, the Securities Act Defendants

8  violated §12(a)(2) of the Securities Act.  As a direct and proximate result of such

9  violations, Lead Plaintiff and the other members of the Class who purchased

10  Xponential stock pursuant to the SPO Offering Documents sustained substantial

11  damages in connection with their purchases.  Lead Plaintiff and the other members of

12  the Class who purchased Xponential stock issued pursuant to the Offering Documents

13  seek damages to the extent permitted by law or seek to rescind and recover the

14  consideration paid for the Xponential stock purchased, and hereby tender such

15  Xponential stock to the Securities Act Defendants.

16        77.     At the time of their purchases of the Xponential stock issued in the SPO,

17  Lead Plaintiff and other members of the Class were without knowledge of the facts

18  concerning the wrongful conduct alleged herein and could not have reasonably

19  discovered those facts prior to the disclosures herein.  Less than one year has elapsed

20  from the time that Lead Plaintiff discovered or reasonably could have discovered the

21  facts upon which this complaint is based to the time that Lead Plaintiff commenced

22  this action.  Less than three years have elapsed between the time that the stock upon

23  which this Count is brought was offered to the public and the time Lead Plaintiff

24  commenced this action.

25

26

27

28

4862-2298-6440.v1

**COUNT III**

**For Violation of §15 of the Securities Act**
**Against Xponential and the Individual Defendants**

78.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

79.     This Count is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of the Class, against Xponential and the Individual Defendants.

80.     Each of the Individual Defendants were control persons of Xponential within the meaning of §15 of the Securities Act by virtue of their positions as directors, senior executives, and/or major stockholders of the Company and exercised actual control over the Company at the time of the SPO and possessed the power to control Xponential in connection with the SPO.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Xponential.  The Individual Defendants were also each critical to effecting the SPO, based on their involvement in preparing and signing the Registration Statement, soliciting investors to invest in the SPO, and by having taken actions to ensure that the SPO was successfully completed.

81.     Xponential was a control person of the Individual Defendants and all of its employees within the meaning of §15 of the Securities Act.  Xponential exercised actual control over the Individual Defendants at the time of the SPO and possessed the power to control the Individual Defendants in connection with the SPO.

82.     This Count does not sound in fraud.  With respect to this Count, Lead Plaintiff does not claim that any of the defendants committed intentional acts or reckless misconduct or that any of the defendants acted with scienter or fraudulent intent.  This claim is based on strict liability and negligence.

83.     By reason of such wrongful conduct, for which the Company and the Individual Defendants are primarily liable, as set forth above, the Individual

- 20 -

Defendants and Xponential are jointly and severally liable with and to the same extent as these primary violators pursuant to §15 of the Securities Act.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, certifying Lead Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Lead Plaintiff hereby demands a trial by jury.

DATED:  June 18, 2024

ROBBINS GELLER RUDMAN
&  DOWD LLP
X. JAY ALVAREZ
DOUGLAS R. BRITTON
JEREMY W. DANIELS


s/ Douglas R. Britton
DOUGLAS R. BRITTON

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
jaya@rgrdlaw.com
dougb@rgrdlaw.com
jdaniels@rgrdlaw.com

Attorneys for Plaintiff

- 21 -